## .CHARLESTON.

Roy Nash, *Assignor et al. v.* Fidelity-Phenix Fire Insurance Company

(No. 6363)

Submitted February 5, 1929.   Decided February 12, 1929.

*Steptoe & Johnson, James M. Guiher* and *Walter V. Ross,* for plaintiff in error.

*James S. Kahle* and *John Kee,* for defendants in error Beauguess and Nash.

LIVELY, JUDGE:

The defendant, Fidelity-Phenix Fire Insurance Company, was awarded this writ to a $2,000.00 judgment obtained by

Roy Nash, assignor, et al., in a proceeding by notice of motion for judgment on an insurance policy.

The plaintiff, Roy Nash, had, for some time prior to January, 1927, conducted a general mercantile business in the City of Bluefield, West Virginia, under the name of "Nash Grocery Company". November, 1926, plaintiff, George Beauguess became a silent partner in the firm. On December 29, 1926, plaintiff, Roy Nash, as active partner in charge of the Nash Grocery Company, secured from a Bluefield agency two insurance policies for $2,000.00 each, covering the stock of merchandise and fixtures in the store, one of which was issued by the defendant insurance company. Both policies became effective as of January 1, 1927, and in each of them the stock of merchandise was insured in the sum of $1,250.00 and the store fixtures to the extent of $750.00, the Nash Grocery Company being designated as the beneficiary.

On January 4, 1927, between two and three o'clock in the morning, the grocery company's stock of merchandise and its fixtures were partially destroyed by a fire. On this date the insured property was valued at $5,000.00. Several judgments were then outstanding against the firm.

As a result of an investigation by the State Fire Marshal Roy Nash was indicted and tried as an accessory before the fact to the burning of the merchandise and fixtures of the Nash Grocery Company, the first trial resulting in a "hung" jury. Before the case could be heard again, Nash was arrested for violating the Volstead Act, and was sentenced to six months in jail on a charge of possessing liquor. He was in confinement at the time of the second trial for arson, when, upon the advice of counsel, he pleaded guilty to having had his automobile destroyed by fire in October or November, 1926, under a compromise agreement with the prosecuting attorney whereby the indictments for burning of the goods and fixtures of the Nash Grocery Company and the store building were nollied.

Upon the trial of the instant case, two colored men, John Worthy and Charley Calhoun, testified that they had, at the instigation of Roy Nash, set fire to the plaintiff's store. (This was denied by Nash.) Worthy and Calhoun had con-

fessed to the arson of the goods and fixtures of the grocery company and had served their sentence on that charge.

The defendant assigns as error the action of the trial court in rejecting the testimony of Mrs. Roy Nash, who stated that a few days prior to the fire her husband, during the course of a conversation had with her at their home, said, ''Before he would let the creditors come in on him and close him out, he would burn the damn thing.'' She stated that because of previous discussions had with her husband in this regard, she knew that he had reference to the burning of the store. This conversation took place about eleven o'clock at night while Roy Nash and his wife were in their bedroom preparing to retire. A Miss Blankenship who was then boarding in the home and clerking in Nash's store was in a nursery room with the Nash children across the hall and about ten feet away. She testified that she heard Nash say, in a loud tone of voice, ''before he would let his creditors sell him out he would burn the damn thing''. The door of the Nash bedroom was open on this occasion, and Mrs. Nash said she heard Miss Blankenship moving around in the room across the hall.

We are of the opinion that the trial court ruled correctly in excluding the testimony of Mrs. Nash regarding the alleged statement. It was clearly a confidential and privileged communication made by the husband to his wife. Defendant contends, however, that the conversation was not privileged because it was made in the presence of a third person, and reliance is had upon *Fuller* v. *Fuller*, 100 W. Va. 309, and kindred cases. An examination of the authorities has failed to reveal a single case in which a wife has been permitted to testify to a conversation taking place between her and her husband in the alleged presence of a third person, unless the husband in making the communication to his wife was aware of such presence. It is not shown in the instant case that the husband knew that Miss Blankenship was listening to their conversation. It was late at night and the statement attributed to him was made in the privacy of his bedchamber.

However, we are of opinion that the court did rule erroneously in rejecting the testimony of Miss Blankenship. For,

even though a conversation between a husband and wife was intended to be confidential, a third person who overheard it, whether his presence was known or not, may testify as to what was said. 40 Cyc., page 2359; *State* v. *Center*, 35 Va. 378; Vol. 5, Wigmore on Evidence (2nd ed.), section 2339 and section 2326. It is the contention of the plaintiffs that the statement testified to by Miss Blankenship was not admissible, because it did not have any legal or logical relation to the arson of the store by Nash. Evidence of incriminating circumstances tending to show a motive for destruction of the property is admissible. 5 C. J., section 53, p. 572. The statement attributed to Nash was indicative of the presence of a design or plan to have his stock of merchandise and fixtures destroyed in order that he might procure the insurance therefor, and has probative value to show that the act was in fact done. Vol. 1, Wigmore on Evidence (2nd ed.), section 102, p. 336. It is true, of course, that the more specific the design, the greater will be its probative value; "but the mere fact that it is generic, i. e., points towards a class of acts, however broad, does not itself destroy its relevancy, provided the purpose might naturally include the act charged." Vol. 1, Wigmore on Evidence, (2nd ed.) section 106. Nash's declaration made a few days prior to the fire was a circumstance to be considered by the jury as of probative value in connection with the other evidence in the case in determining whether he had procured the commission of the arson. *Joy* v. *Liverpool, London & Globe Insurance Co.*, 74 S. W. (Tex.) 822. The rejection of this evidence was prejudicial to the defendant, and is reversible error.

Upon cross-examination of the witness Nash, the defendant brought out the fact that he had confessed to arson of an automobile about two months before the store was destroyed by fire. Under a ruling of the court the defendant made Nash its witness for this purpose. Plaintiff's counsel asked the witness the circumstances surrounding his confession and who had in fact burned the automobile. Nash said that it had been done by a negro, named Calhoun. The defendant then offered the evidence of Calhoun and Worthy to prove that Nash procured Calhoun to destroy his automobile by fire.

This evidence was objected to, and its rejection by the trial court is assigned as error. The plaintiff takes the position that the proof of the confession was improper, but that in any case, the testimony of Calhoun and Worthy on this point was not admissible, because the defendant having made Nash its own witness in this regard could not impeach him on this collateral and immaterial matter. The confession of Nash to the burning of the automobile was properly admissible. Vol. 2, Jones' Commentaries on Evidence, (2nd ed.), section 629, pp. 1169, 1170. Likewise, the testimony of Calhoun and Worthy that just two months prior to the present fire Nash had procured Calhoun to burn his automobile, was competent evidence, as indicative of a plan or system of Nash to procure insurance money, acting through the same agent or agents. *Bank of Pennsboro* v. *Barker,* 75 W. Va. 244; Vol. 1, Wigmore on Evidence (2nd ed.), secton 354, pp. 661, 662; Vol. 2, Jones' Commentaries on Evidence (2nd ed.), section 637, p. 1185. It may be true, as argued by plaintiff's counsel, that a party cannot impeach the general reputation for veracity of his own witness or prove contradictory statements in regard to collateral facts; but ''he may by other witnesses prove the facts are otherwise than as stated, and it is no objection to any relevant evidence of material facts on which he relies to sustain his case, that it may operate to contradict and thus discredit his own witness.'' *Lambert* v. *Armentrout,* 65 W. Va. 375, 377. The alleged destruction of Nash's automobile by Calhoun at the former's solicitation would have been admissible as an independent fact even though Nash had not been interrogated regarding it, and therefore it could be proved notwithstanding Nash's denial when called by the defendant. *Lambert* v. *Armentrout, supra.*

Error is also assigned to the action of the trial court in excluding the testimony of defendant's witnesses Worthy and Calhoun regarding the attempt of Roy Nash to suborn their testimony. There can be no doubt but that such evidence was relevant. Vol. 2, Wigmore on Evidence (2nd ed.), section 960, p. 345. However, the plaintiff claims it was inadmissible because the proper foundation was not laid for its introduction. Roy Nash was asked on cross-examination the

following questions: "While you were confined in the penitentiary of the State of West Virginia, you saw John Worthy, didn't you? A. Yes. Q. I will ask you to state if it isn't a fact that during the time of your confinement and his confinement there, you didn't ask him to change his statement with reference to the testimony that he had heretofore given, and the testimony he said he was going to give? A. I did not." John Worthy was then put on the stand and asked the following question: "Did you have any conversation with Roy Nash with reference to what you would testify in this suit while you were in the penitentiary with him? A. Yes, sir. Q. What did Roy Nash say?" The question was objected to and sustained by the court. In the absence of the jury Worthy made the following answer:

> "He just told me that after things happened like they did, we had bad luck and there ain't but one chance for us to do anything now, and all three of us was up there and we ought to stick together and try to get the insurance, said it would be bad for all of us when we got out of the penitentiary and didn't have anything and we ought to stick together and get the insurance and we would soon be all right and be in shape again and he said the only thing to do is to make it appear that Mr. Welcher tried to get you all to do that and you didn't know what they were going to do and you thought you would do that to make it the easiest way to get out and make it appear that they forced you to do that and after you got into it you just pleaded guilty and took a year and got out the easiest you could and said if you make it appear that way there is no way in the world to keep me from getting the insurance, but he said *scusin* that there wouldn't be no use for me to go down there if you boys don't change your statement."

Although the question put to the impeaching witness was not in the same words as that asked Nash, and could have been made more exact, it was sufficiently precise as to indicate to the impeaching witness the same subject matter or transaction testified to by the former witness, and was not so

general as to introduce irrelevant and improper testimony. *Morgan* v. *Insurance Company*, 6 W. Va. 496; *People* v. *Turner*, 4 Pac. (Cal.) 553, 554. The testimony of the witness should have been admitted.

Complaint is also made that it was error for the trial judge to interrogate the plaintiff, Roy Nash, with respect to the repudiation of his confession as to the burning of his automobile. It is claimed that the length at which the judge questioned the witness in this regard must have created in the minds of the jury the idea that Nash's former offense was unimportant and had no bearing on the case being tried. As has been said, "It is almost an intellectual impossibility for a judge to engage in the examination of a witness on vital questions of the case on trial without in some manner and to some extent indicating his opinion. Every practitioner knows how eagerly alert jurors are to every utterance from the bench and how sensitive is the mind of a juror to the slightest judicial expression." *Sharpton* v. *State,* 1 Ga. App. 542, 57 S. E. 929; *Dye* v. *Rathbone,* 102 W. Va. 386. A judge may ask questions for the purpose of clearing up points that seem obscure, and supplying omissions which the interest of justice demands, but it is not proper that he conduct an extended examination of any witness. *Parker* v. *State,* 132 Tenn. 327, L. R. A. 1916-A, 1190 and note, 178 S. W. 438; Vol. 5, Jones' Commentaries on Evidence, section 2319, pp. 4537 and 4538. We are of the opinion that the extended examination of the witness by the trial judge was error. If reversal depended entirely upon this assignment, we would not likely consider it sufficient, but taken in connection with the other clear errors it buttresses the conclusion that defendant has not had a fair trial. The jury may have concluded that the judge was inclined to believe that plaintiff was innocent of any intention to commit arson. The trial court should be careful not to indicate by word or action his impressions or conclusions of fact which are peculiarly within the sole province of the jury.

The defendant complains of the court's action in instructing the jury that plaintiff had complied with the iron safe clause of the insurance policy. The evidence as to plaintiff's

compliance with the iron safe clause, especially with reference to credit sales, was of such a doubtful nature as to render it a jury question. It was error for the court to give such instruction.

In view of the fact that the case will be reversed for the reasons hereinbefore indicated, we deem it unnecessary to pass upon the sufficiency of the evidence to sustain the verdict.

The judgment of the lower court will be reversed, the verdict of the jury set aside, and a new trial awarded.

*Reversed; new trial awarded.*