Ramoth **STUPPY,** Individually and as mother and natural guardian of Lance Stuppy and Jean Stuppy, minors, Appellee,

v.

**UNITED STATES of America,** Appellant.

No. 76–2004.

United States Court of Appeals,
Eighth Circuit.

Submitted May 18, 1977.

Decided Aug. 3, 1977.

Rehearing and Rehearing En Banc
Sept. 1, 1977.

---

Donald Etra (argued), and Atty., Civil Div., Dept. of Justice, Washington, D. C., Rex E. Lee, Asst. Atty. Gen., Washington, D. C., Bert C. Hurn, U. S. Atty., Kansas City, Mo., and Ronald R. Glancz and Walter A. Oleniewski, Washington, D. C., on brief, for appellant.

James L. Crabtree, Kansas City, Mo., on brief, for appellee. Crabtree also filed brief.

Before VAN OOSTERHOUT, Senior Circuit Judge, STEPHENSON and WEBSTER, Circuit Judges.

STEPHENSON, Circuit Judge.

The central issue on this appeal concerns plaintiff Stuppy's claim of negligence by agents of the defendant, the United States of America. The action below was brought pursuant to the Federal Tort Claims Act[1] by Ramoth Stuppy, the widow of Charles E. Stuppy, who at the time of his death was a psychiatric patient at the Veterans Administration Hospital in Kansas City, Missouri. Plaintiff-appellee Stuppy sought damages on her own behalf, as well as for her children, for injuries resulting from the alleged negligence of the agents of the defendant. A judgment of $50,000 was entered by the district court[2] against the United States. Having concluded upon the record that plaintiff Stuppy has failed to establish her claim of negligence, we reverse the district court's damage award.

At approximately 9:00 a. m. on November 15, 1971, Charles Stuppy, upon the advice of his psychiatrist, drove to the Kansas City Veterans Administration Hospital where he voluntarily presented himself for admission. After an admission interview with a physician, Stuppy was classified as an "emergent" which qualified him for immediate admission. Upon his arrival in the psychiatric ward, Stuppy was strip-searched by a nursing aid. Shortly after lunch Stuppy called his wife to have her retrieve the automobile which he had earlier driven to the hospital. That afternoon, Stuppy was interviewed by the attending resident psychiatrist, who determined that Stuppy should be placed on "accompany status" in the ward for psychiatric patients. Accompany status required that a patient be in the company of a staff member or fellow patients at all times except when asleep.

That evening, Stuppy was escorted to dinner by the nursing staff and was eventually returned to the ward where he watched television. He retired to his room, which he shared with one other patient, at 10:30 p. m. At approximately 1:30 a. m. Stuppy's roommate informed the nurse's office that Stuppy had fallen out of his bed. Upon arrival by the hospital personnel, Stuppy was found lying on the floor of his room in a

1. 28 U.S.C. §§ 1346, 2671 et seq.

2. The Honorable William R. Collinson, United States District Judge for the Western District of Missouri.

coma from which he never revived. He was transferred to the intensive care unit at the hospital and pronounced dead at approximately 5:00 a. m.

The pathology report indicated that Stuppy died from an overdose of desipramine or imipramine, both pharmacologically related drugs which are used as antidepressants. It was stipulated by the parties at trial that an overdose of drugs was ingested by Stuppy sometime after 4:00 p. m. on November 15, and sometime before 1:30 a. m. on November 16.

It was plaintiff's view of the evidence that the lethal overdose of the drugs was either negligently administered by the hospital, or the hospital allowed Stuppy access to the same in violation of its duty and its own standards and regulations.[3] The district court, however, found no evidence to support a finding "that a lethal dosage of the tricyclic drug was administered by hospital personnel accidentally or intentionally." In addition, the district court stated there was insufficient evidence to show conclusively that the pills were obtained directly from hospital supplies or from another patient. The district court did find that Stuppy brought the pills into the hospital on his person or in his effects and that the pills were not discovered during the strip-search or other admission procedures. The critical findings of the court were stated as follows:

> Upon consideration, the Court finds and concludes that defendant's agents owed plaintiff's decedent the duty to search diligently for and seize any contraband including the subject medication. Further, the Court finds that defendant's agents breached this duty by allowing Mr. Stuppy to enter the hospital with contraband and that the breach was a proximate cause of his death.

In light of the entire record, we are not persuaded that Stuppy's entrance into the hospital with contraband is tantamount to a breach of the hospital's duty to diligently search and seize any contraband from him.

At the outset we note that the standard of care to which the defendant's agents must be held is governed by Missouri law.[4] In *Stallman v. Robinson,* 260 S.W.2d 743, 745 (Mo.1953), the Missouri Supreme Court stated that a mental hospital owed its patients the specific duty of exercising reasonable care to safeguard and protect them from self-injury as their known mental condition required. Several years later, in *Gregory v. Robinson,* 338 S.W.2d 88 (Mo.1960), the Missouri Supreme Court enunciated the hospital's standard of care as that of reasonable anticipation of the probability of self-inflicted harm.

Before the district court, Stuppy's counsel apparently argued for the invocation of the *res ipsa loquitur* theory while the government counsel argued that this theory was not amenable following *Gregory* and its progeny. The district court, however, found that the defendant's agents were negligent in their care of Stuppy under both the *Stallman* and *Gregory* standards in breaching the duty to search diligently by allowing Stuppy to enter the hospital with the contraband.

The record reflects that William Ivy's deposition taken on February 22, 1974, was read to the district court in which the search of Charles Stuppy was described. William Ivy was employed as a nursing assistant at the Veterans Administration Hospital in Kansas City and was the person who conducted the search of Stuppy's person and personal effects on the day of Stuppy's admission. Ivy related that the admissions procedure included a strip-search of the patients. This was necessary not only for confiscating any drugs and sharp instruments the patients may have in their possession, but also for weighing the patients. The search was not limited to the patient but included everything the patient carried with him into the ward. Ivy further stated

---

**3.** Plaintiff's proposed finding of fact No. 20.

**4.** In *Richards v. United States,* 369 U.S. 1, 11, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962), the Supreme Court interpreted 28 U.S.C. § 1346(b) to require the forum to apply the entire law of the place where the act or omission occurred.

that he remembered Stuppy in particular. He conducted a strip-search of Stuppy as well as a search of Stuppy's personal effects. A comb and toothbrush were found during the search but there was no contraband found. After relating that he had gone through everything Stuppy had, Ivy stated he was satisfied in his own mind that Stuppy did not have any sharp objects or medications with him. Finally, Ivy indicated that Stuppy was cooperative and that he had no trouble getting Stuppy's clothes off or searching him since Stuppy had been through the admission procedures before and knew what to expect.

No other evidence was introduced in connection with the particular search of Stuppy. Some testimony concerning the general search procedures used at the hospital was elicited. For example, Dr. Donald Milligan, a first-year resident at the hospital at the time of Stuppy's death, stated in a deposition introduced into evidence that discussions had been carried on with the nursing personnel to assure that thorough searches were conducted on all patients admitted to the ward. These discussions were conducted, however, out of the responsibility felt by the doctors on the ward and not because any of the searches had been lax.[5]

With this testimony before it, the district court found that the hospital's search was not diligent. Our careful analysis of the entire record leads us to the conclusion that this finding is clearly erroneous. We find nothing in Ivy's deposition to indicate that his search of Stuppy and Stuppy's personal effects for contraband was not diligent.[6] It is worthy of note that plaintiff Stuppy proposed the following finding of fact to the court after the close of all the evidence:

At 12:30 p. m. on November 15, 1971, upon Mr. Stuppy's being accompanied to the Psychiatric Ward, he was thoroughly stripped, searched, and he brought no drugs onto the ward with him.

In light of the fact that Stuppy's physician had been prescribing approximately 30 capsules of imipramine per week to Stuppy before his admission and the pathology report indicated that Stuppy died from an overdose of imipramine or desipramine, the district court inferred that Stuppy brought the pills into the hospital on his person or in his effects. This factor alone, however, is not sufficient to infer negligence by the hospital. Ivy's uncontradicted testimony reveals that a diligent search of Stuppy and his effects was conducted. Testimony of various hospital personnel established that Stuppy was subjected to the normal admission procedures. He was placed on accompany status whereby he was in the company of a staff member or fellow patients at all times except when asleep. He was observed several times during the early evening hours by nursing personnel and exhibited no unusual behavior. In light of the entire record, we conclude that the hospital was not negligent in its care of Stuppy under either the *Gregory* or *Stallman* standards. To hold otherwise under these circumstances would in effect impose an impermissible standard of strict liability on the government. *See Laird v. Nelms*, 406 U.S. 797, 92 S.Ct. 1899, 32 L.Ed.2d 499 (1972).

We fully realize that it is our duty on appeal to give deference to the factual findings of the trial court. Having carefully analyzed the entire record before the district court, however, we are left "with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948);

---

5. The record reflects that Dr. Warren G. Phillips, president of the medical staff at the local Trinity Lutheran Hospital, testified that patients are admitted to the psychiatric ward at Trinity Lutheran without any type of search.

6. We find nothing in the district court opinion to suggest that it doubted Ivy's credibility. We also note that the totality of Ivy's testimony,

along with several other witnesses, was given in deposition form. This court is not bound by the district court's credibility evaluation of witnesses where the evidence is submitted by deposition or in other documentary form. *Gay Lib. v. University of Missouri*, 558 F.2d 848 at 853 n.10 (1977).

*Salomon v. Crown Life Ins. Co.,* 536 F.2d 1233, 1239 (8th Cir.), *cert. denied,* 429 U.S. 961, 97 S.Ct. 387, 50 L.Ed.2d 329 (1976). We conclude that no cause of action for negligence on the part of the hospital or its employees under Missouri law was established.[7] Accordingly, we reverse the judgment entered against the United States.

Reversed.

---

7. Appellant also argues that the district court should be reversed in its refusal to consider the issue of Stuppy's contributory negligence. The appellees concede that where there is circum-stantial evidence, as here, the trial court may infer contributory negligence. In light of our holding, we need not reach this issue.